Kymberly Sparrow
92-8574 Menehune Dr
Ocean View, Hi 96737
P.O.Box 4004
Clinton, N.J. 08809
(808) 232-4588
ladybirdsparrow2@yahoo.com
808 232 4588

Pro Se

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
07 Dec. 2023 2:14 PM
Lucy H.Carrillo, Clerk of Court

CC:SOM/Filer (by email)

No IFP subm.  LS

# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

KYMBERLY SPARROW, an
individual, JOAN SPARROW, an
individual, J.M.S, Z.H.M, and
S.K.S. minor children by and
through their Biological Mother

            PLAINTIFFS

LEAHNE TOSCANO, in her personal
capacity,
PENNY CHO, an individual,
SHAWN LATHROP, an individual,
WENDY ROBINSON, an individual,
CAROL KITAOKA. an individual,
CHARLES MCCREARY, an individual
STATE OF HAWAII CHILD WELFARE
SERVICES, a public Entity
And DOES 1 through 50,
inclusive,

            DEFENDANTS

CIVIL 23-00578-SOM-WRP

**COMPLAINT FOR DAMAGES AND
DECLARATORY RELIEF**

Claim 1 -    **Unwarranted Seizure**

Claim  2 -    **Deception in The
Presentation of
Evidence**

Claim 3 –     **Declaratory Injunctive
Relief**

       **JURY TRIAL DEMANDED**

## INTRODUCTION

1. This action places before the Court a lawsuit involving the State of Hawaii, County of Hawaii, Department of Human Services (DHS), Child Welfare Services (CWS), Social Workers and Administration of DHS and CWS, The Deputy Attorney General who Represents them, and the Guardian Ad Litem contracted by the state to provide Legal services to the minor children.

This complaint (alleges)  that the minor children, PLAINTIFFS J.M.S, A.H.M. and S.K.S. were Removed from their Family Home illegally  and have been withheld from their Family for the past two years unjustly and unlawfully. The children have been Alienated towards their Family and the Family has not been allowed visits or phone calls, contact, or Family Therapy.

The three children were removed without a warrant or Court Order when no emergency or exigency existed.  There was no investigation conducted before their removal.  . There was no attempt to NOT REMOVE  the children and place them in foster care. There was no attempt to contact the MOTHER, KYMBERLY DAWN SPARROW prior to their removal. .There was no attempt to contact the MATERNAL GRANDMOTHER JOAN SPARROW (with whom the children were residing in the family home) prior to their removal. **MOTHER  was not given notice of the Court Hearing authorizing the removal until eight days after the Hearing had been held**.  MATERNAL GRANDMOTHER was not ever given notice of the Hearing.

This complaint also alleges a conspiracy to deprive the Family plaintiffs of their rights based on race or class. As well as Willful, Knowledgeable and Malicious Disregard to the Violation of said rights, for the gain of the Defendants.

### Jurisdiction and Venue

Plaintiffs, KYMBERLY DAWN SPARROW and JOAN SPARROW bring this lawsuit pursuant to  42 USC-section 1983 et seq  to redress the deprivation of rights secured to them under the United States Constitution including the First,  Fourth, and Fourteenth Amendments and  under federal and state laws where applicable.  Said deprivations were inflicted by the defendants herein,

each of them in some manner.  Each of the Defendants were at all relevant times acting under

color of law.

Jurisdiction is conferred pursuant to 28 USC section 13433 (a)(3) and 1343 (a)  (4) which

provides for original jurisdiction in this court of all suits brought pursuant to 42 USC section

1983. Jurisdiction is also conferred by 28 USC section 1331 because the claims for relief derived

from the United States constitution and the laws of the United States.   Jurisdiction to

grantee/injunctive relief is conferred by 28 USC section 22:01

1.  Because the facts and omissions complained of herein occurred in Hawaii and it is

believed that all living parties currently reside in  the State of Hawaii.

KYMBERLY SPARROW is incarcerated currently in the State of New Jersey, however her

home state is Hawaii.

2.  Plaintiffs are informed and believe and therefore allege that County of Hawaii Child

Welfare Services is a government entity and an arm of the State of Hawaii

## II. PARTIES

Plaintiffs:

3.  KYMBERLY DAWN SPARROW ("PLAINTIFF" "MOTHER") is the Biological

Mother and has Legal Rights to the minor children, PLAINTIFFS J.M.S., A.H.M.

and S.K.S.  her address is. # 115879H, E.M.C. F., 30 County Rd, Route 513,

Clinton, N.J.  08809.

4.   JOAN SPARROW ("PLAINTIFF" "GRANDMOTHER") is the Biological Maternal

Grandmother of the minor children J.M.S., A.H.M. and S.K.S. She was the Legal

Caretaker for the three  minor children and the children had been living with her in the Family Home for the previous two and a half years until they were Removed from the Family Home.by CWS. Her address is 92-8574 Menehune Dr., Ocean View, Hi  96737, which is the family home.

5. Minor children J.M.S. (D.O.B. 10-22-08), A.H.M. (D.O.B. 12-22-10) and S.K.S. (D.O.B. 5-7-15) ("MINOR PLAINTIFFS"). The children's Biological Mother, KYMBERLY DAWN SPARROW, whom has Legal Rights to the children, is filing on their behalf.


Defendants:

6. STATE OF HAWAII, also known as "the State", (" DEFENDANT"), whom receives the Federal Funding for taking children into Foster Custody.

7. COUNTY OF HAWAII ("DEFENDANT"), which was the County in which all of the Events Transpired.

8. DEPARTMENT OF HUMAN SERVICES ("DHS" "DEFENDANT"), also known as DHS or "The Department", is the Head office and Department for CHILD WELFARE SERVICES.

9. CHILD WELFARE SERVICES, also known as CWS, ("DEFENDANT") is the State Agency that took Custody of the minor PLAINTIFFS on 11-26-21. There address is 73-4257 Hulikoa Dr. #C Suite 3004

Kailua-Kona, HI - 96740 .

10.  LEAHNE TOSCANO  ("DEFENDANT TOSCANO").is and was the Section Administrator for

West Hawaii. Child Welfare Services, located at  73-4257 Hulikoa Dr. #C Suite 3004

Kailua-Kona, HI - 96740 .

with supervisory responsibility and authority  to oversee the Social Worker employees.

PLAINTIFFS are further informed and believe and on such basis allege that LEAHNE TOSCANO at

all times relevant had the plenary and final power to promulgate  and implement policies

governing the conduct of CWS in relation to the agents handling of juvenile dependency matters

including the power to hire, fire, train and supervise CWS employees. On further information

and belief allege that LEAHNE TOSCANO resides in Hawaii County and in is an officer,  agent,

employee of the State of Hawaii. LEAHNE TOSCANO is sued herein in her personal capacity..  On

information and belief and/or in the alternative to delegate such duties to DOES 1 through 50.

11.  , PENNY CHO,  CWS Social Worker (" DEFENDANT" "CHO"),was the Social

Worker who had the PLAINTIFFS, minor children J.M S., A.H.M. and S.K.S. Removed

from their Family Home on 11-26-21. She was the Social Worker on the cases for only

about a week and then she went on  Leave and promptly Retired.

12.   SHAWN LATHROP (DEFENDANT "LATHROP"), CWS Supervisor. was the

Supervisor on the cases when the PLAINTIFFS minor children J.M.S, A.H.M and S.K.S.

were Removed from their Family Home on 11-26-21 and was the Supervisor of PENNY

CHO, at the time of the removal. . He became the Social Worker handling the cases

when DEFENDANT PENNY CHO left CWS, approximately one week after Removing

the children. He remained on the cases until he was removed, effective 7-14-22.

13. . WENDY J. ROBINSON ("DEFENDANT" "Robinson"), CWS Supervisor. became the Supervisor in September of 2022, and the new Social Worker on the cases after SHAWN LATHROP was removed.


14. CHARLES H. MC.CREARY IV, Deputy Attorney General ("DEFENDANT" "MCCREARY") The State's Legal Representative. Has been on the two CWS (FCS) cases since their inception.

15. CAROL KITAOKA, Guardian Ad Litem, also known as GAL, ("DEFENDANT KITAOKA"). She was assigned by " the State" to represent the PLAINTIFF'S, minor children J.M.S., A.H.M and S.K.S. She was assigned to the case shortly after the children were Removed from their Family Home and has been on the cases for the duration.

16.  Defendants DOES 1 through 50 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs.  When ascertained, PLAINTIFFS will amend the Complaint by inserting their names and capacities.  PLAINTIFFS are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. All Defendants are Hereby sued in  their Individual as well as official capacity, Jointly and Severally, for those acts and omissions described herein.  On information and belief, PLAINTIFFS  make all allegations contained in this Complaint against all Defendants, including DOES 1 through 50.

## III. SUPPLEMENTAL JURISDICTION AND VENUE

17. Jurisdiction is asserted pursuant to the United States Constitution and 42 U.S.C. & 1983, to redress the deprivation of those rights secured by the United States Constitution, deprived by persons acting under color of State law. The Court has jurisdiction over these matters pursuant to 28 U.S.C. & & 1331 , 1343(a)(3).

18.  Pursuant to the District Courts having Original Jurisdiction, Supplemental Jurisdiction is asserted under 28 U.S.C Section 1367(

## IV. STATEMENT OF FACTS

19. In November of 2018, PLAINTIFF JOAN SPARROW and her husband Richard Meyer purchased six acres of land on the Big Island of Hawaii, with a 3 Bedroom/ 2 Bath Home on the Property. This property was intended to become the Family Home and Farm for PLAINTIFF JOAN SPARROW and her husband Richard Meyer, as well as PLAINTIFFS KYMBERLY DAWN SPARROW and her minor children, PLAINTIFFS J.M.S, A.H.M. and S.K.S., all of whom at the time were living on the island of O'ahu. Shortly, thereafter, (November of 2018) the aforementioned Family moved into that Family Home Together.

20. PLAINTIFF KYMBERLY DAWN SPARROW was incarcerated in New Jersey in April of 2019. Despite being held , at a substantial distance from her minor children, PLAINTIFFS J. M.S., A.H.M. and S.K.S., she maintained contact and a close relationship with her children by calling them on the phone several times everyday, and remained very involved in their lives  until the children were Removed from their Family Home and PLAINTIFF KYMBERLY DAWN SPARROW was not allowed Contact with her minor children PLAINTIFFS J.M.S, A.H.M. and S.K.S.

21. PLAINTIFF KYMBERLY DAWN SPARROW signed a Power of Attorney for her Mother, PLAINTIFF JOAN SPARROW to be able to not only care for the children, but to Legally be able to enroll them in school, make medical decisions for them, apply for benefits if needed, etc., while PLAINTIFF KYMBERLY DAWN SPARROW was Temporarily out of the Family Home.

22. PLAINTIFF KYMBERLY DAWN SPARROW had been renewing the Power of Attorney every year (as is the proper procedure under the law of Hawaii).

23. On or around 10-13-21 until 11-22-21, Sasha Sparrow, the sister of PLAINTIFF KYMBERLY DAWN SPARROW, daughter of PLAINTIFF JOAN SPARROW and Maternal Aunt of minor PLAINTIFFS J.M.S, A.H.M. and S.K.S was Vacationing in Hawaii from California  with her two children to visit her Mother PLAINTIFF JOAN SPARROW and her husband Richard Meyer and her nieces and nephew PLAINTIFFS J.M.S, A.H.M and S.K.S.

24.  While there, Sasha Sparrow decided that she wanted Custody of the minor children, PLAINTIFFS J.M.S, A.H.M and S.K.S and wanted to take them back to California to live with her and their cousins.

Sasha Sparrow convinced the three  minor children that living with Grandma, PLAINTIFF JOAN SPARROW, was  terrible, boring and not fun because she was elderly  and if they lived in California with her and their cousins  it would be "wonderful", because there was so much more to do in California.  . MOTHER, PLAINTIFF KYMBERLY DAWN SPARROW refused to give permission for the children to live with Sasha Sparrow in California.

Sasha Sparrow continued plotting and Manipulating the children to turn them against

their Mother and Grandmother and get the children and Richard Meyer to join her in a

conspiracy plot, in order for Sasha Sparrow to ultimately get Custody of the children.

25.  Because of all of the problems Sasha Sparrow was causing in the Home,

PLAINTIFF JOAN SPARROW had to repeatedly call the Police.

In the very first Police report it even reports that Sasha Sparrow was asking the Police

how she could get the Custody of the children away from their Grandmother,

PLAINTIFF JOAN SPARROW and get Custody of the PLAINTIFF'S, minor children

J.M.S, A.H.M. and S.K.S . for herself.


26. The PLAINTIFF, minor child A.H.M. Disclosed to Mother PLAINTIFF KYMBERLY

DAWN SPARROW, on a Recorded phone call, that their Antie Sasha was having them

mess up the House on purpose so that she could take PICTURES of it.

Then minor child, PLAINTIFF J.M.S., also threatened that if Mother, PLAINTIFF

KYMBERLY DAWN SPARROW did not allow them to go back to California with Auntie

Sasha, that they would put themselves in CPS ( CWS, Child Welfare Services).


27.  It was later discovered that Sasha Sparrow was also "coaching" the minor children

and Richard Meyer on what to say and do for the children to get taken into CWS (Child

Welfare Services) Custody.


28. On November 26, 2021, the three minor children: PLAINTIFFS J.M.S., A.H.M. and

S.K.S. were Removed from their Family Home without a Warrant or Court Order and

with No Emergency situation existing, or valid reason with which to necessitate said

Removal.

29. DEFENDANT Social Worker (SW) PENNY CHO made no attempts whatsoever to prevent Removal of the subject children, PLAINTIFFS J.M.S, A.H.M. and S.K.S. from their Family Home. The children's Mother, PLAINTIFF KYMBERLY DAWN SPARROW, was not contacted prior to the Removal of her three children from their Family Home and placed in CWS (Child Welfare Services) Custody, or contacted before the three children were placed with Non-Relatives in Foster Custody.

30.  The children's Grandmother, PLAINTIFF JOAN SPARROW, who was the children's caretaker for the previous two and a half years and with whom the children were living at the time was also not contacted prior to the Removal of her three grandchildren from their Family Home or Before being placed in CWS Custody.

No attempts were made to contact the Fathers Before the removal.

31. MOTHER received the Summons for the Hearing which was held on 12-2-21, through the regular mail  on 12-10-21, EIGHT days AFTER  the Hearing.  Enclosed was the  Safe Family Home Report dated 11-30-21 and written by Defendant Social Worker PENNY CHO.

32.  Upon reading through the Report, MOTHER  immediately knew that the pictures in the report that CWS (Child and Family Services) were portraying as being taken on 11-26-21 (the day that the minor children, PLAINTIFFS J.M.S., A.H.M. and S.K.S. were removed from their Family Home) were NOT taken on that day or by the Social Worker,  PENNY  CHO or taken on PENNY CHO'S phone by J.M.S. as it states in the Safe Family Home Report, but  were in

fact  taken in the weeks  prior and were "staged" to look as bad as possible and taken by Sasha

Sparrow, Between 11-6-21 and  11-19-21, in her planned agenda to get Custody of the minor

children,  J.M.S, A.H.M., and S.K.S. It was also obvious to MOTHER that Sasha had also

worked very hard and spent a great deal of time editing the pictures and putting captions on them

to make them look as horrifying as she could. Sasha Sparrow had to have then sent the pictures

to Defendant Social Worker PENNY CHO.  These staged photos were used as the reason why

the children were removed from their family home.

33.   In one of the pictures attached to the SFHR it depicts the children's bedroom with single

beds, disheveled with pillows, laundry and books and stuffed animals everywhere.  On this

particular day Sasha's son decided to engage S.K.S. and jump on the beds and have a  pillow

fight and strew clothes and bedding everywhere.  They ripped the fabric on the bed box springs

and wrote with black markers on the beds.  They pulled off the mattresses, pulled all the books

off the shelves.  I went in to find the room in absolute chaos and the room had been

destroyed.  Maternal Grandmother ordered  the boys to get it cleaned up immediately.  Sasha

went in and took pictures.

34.   GRANDMOTHER and MOTHER had been asking Richard if they could get bunkbeds for

that room and he finally agreed.  The old twin beds were removed and the new bunkbeds moved

in and set up 11-19-21.  Those new bunkbeds are clearly not seen in the photos supposedly taken

on 11-26-21.

35.  When MOTHER read the Report, and looked at the pictures attached she knew immediately

that those pictures were NOT taken 11-26-21, the day the children were removed from their

family home.  None of the allegations contained therein were accurate or true. The allegations

also did not rise to the Legal Level that would necessitate Removal of the children from their

Family Home. It was obvious that CWS protocol  and the Law were NOT being followed.

36.   In addition, several facts written in the Report came to light, which were Extremely

Suspicious and spoke to the fact that there was a Conspiracy and that the whole thing was a set

up.

37. Why would  SW PENNY CHO. drive out to Ocean View (a two  hour drive and sit on the

side of the road at the address of  PLAINTIFF MATERNAL GRANDMOTHER JOAN

SPARROW,  the family home?  Why did she not drive up the driveway of the six-acre

property?  There were two cars sitting outside the house, why did she not just go and knock on

the door?

38.  Instead, she just waited for J.M.S.,  the eldest child to walk out to the road accompanied by

her two siblings. If Defendant  SW PENNY CHO  was there to conduct a welfare check, why did

she not then use J.M.S's. cell phone to call Plaintiff Maternal Grandmother, JOAN SPARROW,

with whom the children were living ?   .JOAN SPARROW had taken her husband, Richard

Meyer to the ER in Kona and was in phone contact with minor J.M.S.  and could have driven

home and invited PENNY CHO into the house to do her investigation and interview,  However

none of that happened.  Even though MATERNAL GRANDMOTHER JOAN SPARROW called

and spoke to J.M.S at around 12 noon, she was not told that the CWS Social Workers were there.

39.  Instead, J.M.S. apparently lied and told PENNY CHO that "Grandma"  had gone shopping,

when she knew that her Grandma had taken her Grandpa to the hospital ER in Kona.  J.M.S then

fabricated a series of lies, stories  and mistruths because she wanted to go to California and stay

with her Auntie Sasha and her cousins.

40. Defendant Social Worker PENNY CHO  went on leave within a week of Removing the three  children. A Reliable Source Disclosed that PENNY CHO wanted to retire and leave the Department but  had been told she would have to do one more removal before she could leave. This would seem to align with her actions as she took her Vacation Leave immediately upon completing the Report and Court Appearance and never returned to active duty. Once her Vacation time was Finished, she promptly Retired.

41. On 12-15-21 at 10:00 a.m. PLAINTIFF KYMBERLY SPARROW was served with a summons for Court Hearings regarding her three minor children, to be held on 12-16-21 at 9:00 a.m. and 9:30 a.m. That was only 24 Hours notice and Not proper service by Law.  Although attempts were made it was simply not enough time for her to make arrangements to be able to attend the Hearings.

42. . DEFENDANT, CWS Supervisor SHAWN LATHROP sent emails to PLAINTIFF JOAN SPARROW , as well as PLAINTIFF KYMBERLY DAWN SPARROW on 12-15-21, which, in summary, said that his worker would come to the Family Home that day and assess for Safety and Hygiene and if the Home was assessed as Safe, then the children would be able to be reunified with Maternal Grandmother (PLAINTIFF JOAN SPARROW) with an in-home safety plan and services in place, OR a court order, and that there was a Court Hearing for this matter the next day, 12-16-23 at 9:00 a.m. and that PLAINTIFF JOAN SPARROW should attend and ask the Judge to be made a party to the cases.

43.  Plaintiff JOAN SPARROW attended the 12-16-21 Hearings and the Judge made her a Party to the cases. Plaintiff JOAN SPARROW asked the Judge if she could read her prepared Statement and the Judge said that would be appropriate at the next Hearing.    There was a different Judge at the next Hearing and he would not allow Plaintiff JOAN SPARROW to speak.

44. DEFENDANT CWS Supervisor SHAWN LATHROP then went back on his word to reunify the minor three children with . PLAINTIFF JOAN SPARROW.  She  received another email from SHAWN LATHROP stating that the Guardian ad Litem Carol Kitaoka,  said she would not allow the children to be returned to Maternal Grandmother and that she wanted all visitation with Maternal Grandmother to be  suspended.  DEFENDANT CAROL KITAOKA, GUARDIAN AD LITEM, has refused to communicate with PLAINTIFFS KYMBERLY DAWN SPARROW and JOAN SPARROW  despite numerous emails being sent and messages left by phone.

45. DEFENDANT CWS Supervisor SHAWN LATHROP never mentioned a word in Court at the Hearing on 12-16-21 about the Family Home being investigated the day before and found to be Perfectly Safe and Hygienic. In fact, he never made mention of that in any reports or at any time. There was also another "surprise" Home inspection done on the Family Home by two CWS Social Workers, sometime between 12-16-21 and 2-10-22. The Family Home was assessed as Safe and Hygienic at that time, as well, but again this was never mentioned anywhere.


46.  At the Court Jurisdiction Hearing on 2-10-22, the Judge asked GAL CAROL KITAOKA  to go to the family home and do an inspection and interview the MATERNAL GRANDMOTHER which she has refused to do.

At the Court  Jurisdiction Hearing on 2-10-22, the Judge Ordered DEFENDANT SW Supervisor SHAWN LATHROP to do a NEW investigation and write a NEW Safe Family Home Report because of the fact that the State's Attorney, DEFENDANT CHARLES H. MC.CREARY IV, Deputy Attorney General, was claiming that they could not produce DEFENDANT CWS SW PENNY CHO in court to be Questioned, because they could not locate her, fraudulently stating they believed that she had moved and possibly relocated to Washington.

(Nearly everyone on the Island of Hawaii knows each other and knew that to be NOT TRUE,

DEFENDANT PENNY CHO never moved and is believed to be working at Hawaiian Airlines.

The State obviously thought it would not be a good idea to have her appear in court to be

Questioned on why she had the Plaintiff minor children J.M.S, A.H.M. and S.K.S. Removed

from their family home, when protocol was not followed and there was no investigation.)


47. DEFENDANT CWS also deliberately hid the fact that there was another CWS Social

Worker, LACEY KALAHIKI, who accompanied SW PENNY CHO, the day the children were

removed.  In fact this fact was never disclosed to the PLAINTIFFS.  It was discovered by

Plaintiff JOAN SPARROW in February of 2022, when Supervisor SHAWN LATHROP was on

vacation and SW LACEY KALAHIKI was left in charge and told JOAN SPARROW herself that

she had been with PENNY CHO, the day the children were removed.  Apparently Supervisor

SHAWN LATHROP  was extremely upset that this information had been told to PLAINTIFF

JOAN SPARROW.   The Judge, however  was shocked and very upset when this information

was disclosed by PLAINTIFF'S Council at the Hearing and questioned  the Department as to

why this information had not been provided previously.

48. .It is alleged and believed that Supervisor SHAWN LATHROP  violated the Court Order

from 2-10-22 because he just kept DEFENDANT PENNY CHO'S Safe Family Home Report

and just attached  his NEW Report and just added "Updates", stating the home must have been

cleaned up, when on his surprise visit he discovered a beautiful very well kept home.   He also

"Confirmed" PLAINTIFF JOAN SPARROW as the Perpetrator of abuse and neglect against the

PLAINTIFF minor children; J.M.S, A.H.M and S.K.S  and said that MATERNAL

GRANDMOTHER  JOAN SPARROW WAS CONFIRMED IN THE First Family Home Report

when in fact Defendant SW PENNY CHO had previously NOT confirmed her in the Safe

Family Home Report written by DEFENDANT SW PENNY CHO.


49. DEFENDANT CWS Supervisor SHAWN LATHROP did not find any evidence to "confirm"

PLAINTIFF JOAN SPARROW when he did his investigation, yet he "confirmed" her anyways,

without having any  evidence to do so.


50.  It is alleged and believed  that DEFENDANT CWS Supervisor SHAWN LATHROP

"confirmed" PLAINTIFF JOAN SPARROW as a perpetrator of child abuse and neglect for two

reasons:


1.  DEFENDANT CWS Supervisor SHAWN LATHROP was perturbed that the Judge had

     also ordered him on 2-10-22 to allow PLAINTIFF JOAN SPARROW to become

     Licensed as a Placement for the minor children and DEFENDANT CWS Supervisor

     SHAWN LATHROP wanted to Block her from being able to get Licensed, because...

2.  DEFENDANT CWS Supervisor SHAWN LATHROP was angry at PLAINTIFF JOAN

     SPARROW for challenging him and proving that he had never read the initial Safe

     Family Home Report that he signed off on as Supervisor and had a clear Motive to want

     to get Revenge on her.

     MATERNAL GRANDMOTHER JOAN SPARROW, completed all of her services

     under the family service plan, including a psychological evaluation, which according to

     Dr. Choy was "very favorable".  The Department refused to provide PLAINTIFF JOAN

     SPARROW with a copy of her Psychological Evaluation for several weeks stating that

it was lost and could not be located.  Supervisor SHAWN LATHROP told

MATERNAL GRANDMOTHER JOAN SPARROW he would NEVER return the

children to her care.

51.   DEFENDANT CWS Supervisor SHAWN LATHROP did not record accurately what

Grandmother had told him when he interviewed her on February 16, 2021, but instead

fabricated what was said when writing his Safe Family Home Report  dated 2-24-22.

52.  DEFENDANT CWS Supervisor SHAWN LATHROP  perjured himself numerous times

in  court, when he Testified, including  stating that the reason that PENNY CHO did not

go onto the property or into the house to do a proper inspection and investigation was

because there was a "No Trespassing" sign.  There is not now and never has been a "No

Trespassing" sign on the property.

53. DEFENDANT CWS Supervisor SHAWN LATHROP took almost Seven Months to

provide the MOTHER of the minor children, PLAINTIFF KYMBERLY DAWN

SPARROW, phone visits with her children, despite her repeatedly asking for them for the

duration of that time.

54.  The phone visitation lasted for only approximately 2 weeks because the Resource Care

Givers were supervising and they apparently became jealous of the Relationship,

55.  MOTHER, PLAINTIFF KYMBERLY DAWN  SPARROW had with her minor children

and that she obviously wanted them back, so the Resource Care Givers lied and made the

children lie about what was happening during the visits to try to get them stopped.

56. PLAINTIFF KYMBERLY DAWN SPARROW received an email from DEFENDANT

CWS Supervisor SHAWN LATHROP reporting what the Resource Care Givers were reporting

to him about how MOTHER was being in inappropriate during her visits with the children. It

also stated what the children allegedly said, which in essence described the same or similar accounts. PLAINTIFF KYMBERLY DAWN SPARROW responded with an email to DEFENDANT CWS Supervisor SHAWN LATHROP explaining that First of all, she would never be inappropriate with her children and secondly, that all of her phone calls are RECORDED, so she could prove what transpired during those phone calls and that would mean that the Resource Care Givers are lying and that they must therefore also be making the children lie as well.

57.   When that plot to stop PLAINTIFF KYMBERLY DAWN SPARROW's visits with her children, did not work, the Resource Care Givers then clearly began using other tactics such as saying the children were not available because they had to walk the dog or it was breakfast time.  Then started using Parental Alienation on the minor children and started making the children say that they did not want to have visits with their MOTHER, PLAINTIFF KYMBERLY DAWN SPARROW.  DEFENDANT CWS Supervisor SHAWN LATHROP allowed this to go on.

58. Approximately the end of June 2022, PLAINTIFF JOAN SPARROW was told by her Attorney William Reese that DEFENDANT CWS Supervisor SHAWN LATHROP was rep caught repeatedly lying in Court on another case that he had with him and our same Judge, Judge Kimberly Taniyama. Apparently, Judge Taniyama had to reprimand DEFENDANT CWS Supervisor SHAWN LATHROP for repeatedly lying in Court.

56. The first week of July, 2022, PLAINTIFFS KYMBERLY DAWN SPARROW and JOAN SPARROW received an email from DEFENDANT CWS Supervisor SHAWN LATHROP saying that his last day would be 7-14-22. The PLAINTIFFS KYMBERLY DAWN SPARROW and JOAN SPARROW were never told the reason for the removal and transfer of DFENDANT CWS Supervisor SHAWN LATHROP.

59. KYMBERLY DAWN SPARROW wrote a two- minute speech to give at the Beginning of the upcoming Ohana Conference scheduled for 10-20-22.. (Epic Ohana asks Parents to give a short opening speech at the start of their Ohana Conferences.) However, about 20 seconds into the speech, as soon as PLAINTIFF KYMBERLY DAWN SPARROW mentioned the importance of Family Therapy and that it would be the Most important thing to discuss since the Therapists were in attendance, the Epic Ohana Facilitator cut off PLAINTIFF KYMBERLY DAWN SPARROW and would not let her continue. PLAINTIFF KYMBERLY DAWN SPARROW tried repeatedly for the rest of the two-Hour Conference to bring up Family Therapy but they refused to let her talk about it.

60.  In October of 2022, when Mother called to try to do her regularly scheduled phone visit, the cell phone that CWS had provided to do the visits on was out of minutes and the calls would not go through. PLAINTIFF KYMBERLY DAWN SPARROW notified the new  DEFENDANT CWS SUPERVISOR WENDY ROBINSON of this fact by email.   DEFENDANT CWS SUPERVISOR WENDY ROBINSON never put more money or minutes on the phone. PLAINTIFF KYMBERLY DAWN SPARROW continued to send frequent email reminders asking DEFENDANT CWS SUPERVISOR WENDY ROBINSON to please put minutes or money on the phone so that phone number would not be lost or disconnected, but she never did and after 90 Days of no money being put on the visit phone account, the phone carrier completely Disconnected the Service.


61. On November 22, 2022, the PLAINTIFFS were Notified that DEFENDANTS DHS/CWS via DEFENDANTS WENDY ROBINSON and CHARLES H.MC.CREARY had filed a Motion to place the minor children with their Maternal Aunt, Sasha Sparrow in California.

62.PLAINTIFFS KYMBERLY SPARROW  and JOAN SPARROW finally agreed not to fight the placement with SASHA SPARROW.  In Therapy sessions between MOTHER,  KYMBERLY SPARROW, MATERNAL GRANDMOTHER, JOAN SPARROW and MATERNAL AUNT SASHA SPARROW. it was finally agreed seeing as that was what the children seemed to want and was the reason that they had put

PLAINTIFF J.M.S.
touching Sexual A
(The Sexual Abuse

63. DEFENDANT
Jurisdiction Trial w
witnesses that she
these are Key Wit
the children, DEFE
DEFENDANT CHA
mark on the Jurisc
for this long and n
her case!

themselves in CWS in the first place that continuing to oppose placement with Sasha was counter-productive.

63. However, as soon as the DEFENDANTS found out that the PLAINTIFFS were in favor of this Motion to place the children with SASHA SPARROW, they immediately withdrew their motion  at the Hearing that was to Grant it, without any valid reason.  (In fact, the Judge had already drawn up the Court Order Granting the Motion even before having the Hearing.)

64. Before Christmas of 2022, SASHA SPARROW was in Hawaii with her sons, the children's cousins and had rented a B&B to have visits with the minor children. She had asked for overnight visits and had been denied.  However on this particular night there was a very bad storm and as SASHA SPARROW was driving on the road from Naalehu to meet up with the RCG's and return the children they got caught on the road with fallen trees blocking the road and electrical wires waving in the wind and all the children were scared.  She called Supervisor Social Worker, Wendy Robinson to tell her of the dangerous conditions on the road and told her that the police were saying that it would be several hours before the road would be cleared and asked if she could please just turn around and take the children back to the safety of the B&B and was told "No. Overnight visits are not approved".   Sasha Sparrow   tried to explain to WENDY ROBINSON that it was time for her to make an executive decision for the safety of the children.  SASHA SPARROW  explained again how dangerous this was and that her cell phone was running low on charge and

WENDY ROBINSON again said No and you must call the RCG's and make arrangements to meet up with them and return the children.  The RCG told Sasha she would have to call her back but that her husband, the RCG who was a police officer had confirmed that it would be hours before the road would be cleared.  SASHA SPARROW then took the children back to the safety of  the B&B and did not hear from the RCG's until the next morning.

65. When SASHA SPARROW testified about this incident and others which had occurred and that were divulged to SASHA SPARROW by the children,  the children were apparently reprimanded by the the Supervisor WENDY ROBINSON  and the GAL CAROL KITAOKA  who became very angry and became very upset with the children for "telling on them",  making the children feel so bad that Jazzyra it was reported  resorted  to self harm.    All of this was testified to by SASHA SPARROW at the Hearing.  PLAINTIFF KYMBERLY SPARROW's Court-appointed attorney, Jacob Delaplane,  then asked for a Continuance of the Motion that was to be heard stating that in light of what had just been heard in Court about the actions of Defendants Supervisor Wendy Robinson and GAL Carol Kitaoka, that it was going to be necessary to file motions to have the SW WENDY ROBINSON  replaced and the GAL CAROL KITAOKA removed, but then he never moved forward with these actions.

66.  PLAINTIFF KYMBERLY DAWN SPARROW had had to have her Attorney file MOTHER's own Motion to place the children with their

MATERNAL AUNT SASHA SPARROW. The PLAINTIFFS had been battling to get this Motion Granted for the past year and it was repeatedly delayed and sabotaged.  It is alleged and believed that "someone"  finally   put minor PLAINTIFF J.M.S. "up to" filing Charges against her cousin (Sasha Sparrow's son) for "inappropriate touching'  in order to prevent the children from being placed with their Aunt, Sasha Sparrow. (These charges are False and can be proven so, but the Damage is done).

67.   DEFENDANT CHARLES H. MC.CREARY IV has been putting continued pressure on the Judge to end the Jurisdiction Trial without allowing "MOTHER", PLAINTIFF KYMBERLY DAWN SPARROW to call the rest of the witnesses that she needs to call to prove there was no reason to Remove the children from their Family Home ( these are Key Witnesses, such as the Police Officer that Removed the children, the Social Worker that Removed the children, DEFENDANT PENNY CHO, etc.) or to submit evidence that was never allowed to be submitted.

DEFENDANT CHARLES H. MC.CREARY IV justified this by pointing out that we have now reached the two year mark on the Jurisdiction Trial, But it was because of the DEFENDANTS that the Trial has been purposely continued and dragged out for this long and now they are trying to stop "MOTHER", PLAINTIFF KYMBERLY DAWN SPARROW from presenting her case.

## **V. CAUSE OF ACTION**

**FIRST CLAIM FOR RELIEF**

**For Violation of Civil Rights (42 U.S.C.  Section 1983)**

68. PLAINTIFF realleges, and incorporates herein as if set forth in full, paragraphs 1 through 65, above.

69.  DEFENDANT PENNY CHO, Social Worker for DEFENDANT CHILD WELFARE SERVICES Removed the children from their Family Home on 11-26-21 without a Legal reason for the Removal, without a Warrant or Court Order, without making any attempts whatsoever to prevent the Removal of the children from their Family Home, violating PLAINTIFFS rights to unreasonable search and seizure under the Fourth Amendment of the United States Constitution. Violating the PLAINTIFFS' rights to life, liberty and property without due process of law under the Fifth and Fourteenth Amendment of the United States Constitution. and Violating PLAINTIFFS' rights by her actions and omissions while acting under color of state law, which therefore also makes The State of Hawaii, County of Hawaii, Department of Human Services, Child Welfare Services, Section Administrator, LEAHNE YOSCANO and her CWS Supervisor SHAWN LATHROP liable for not obeying Family First Preventative Services Act and their obligations as signatories to the Title IVE Waiver to receive Federal Funding for FFP (Federal Foster Payments), as well as The Constitution of The United States of America giving rise to a civil action under Section 1983, as well as being in Violation of the Plaintiffs rights under The

Constitution of The State of Hawaii.

Furthermore, by conspiring with entities and state agencies, acting under color of State Law to deprive the PLAINTIFFS of their rights on account of race or class, gives rise to action under [ Section 1985], and with knowledge of said conspiracy of using actions under  color of state law to deprive PLAINTIFFS of their rights and failing to act to prevent it [Section 1986].

70.   DEFENDANTS: THE STATE OF HAWAII, COUNTY OF HAWAII, DEPARTMENT OF HUMAN SERVICES,  CHILD WELFARE SERVICES, SECTION ADMINISTRATOR, LEAHNE TOSCANO, SUPERVISOR SHAWN LATHROP, SOCIAL WORKERS PENNY CHO and WENDY ROBINSON, DEPUTY ATTORNEY GENDERAL CHARLES H. MCCREARY IV, and STATE APPOINTED GUARDIAN LITEM CAROL KITAOKA have with their acts and omissions deprived the PLAINTIFFS, as well as conspired to deprive the PLAINTIFFS and done so willingly and with knowledge and  intent to do so, for their own gain.

71.  Therefore causing PLAINTIFFS KYMBERLY DAWN SPARROW, JOAN SPARROW, J.M.S, A.H.M. and S.K.S to be deprived of their rights of Life , Liberty and Property under the Fourteenth Amendment of the United States

Constitution, their rights to Familial Association under the Fourteenth Amendment of The United States Constitution, their rights to due process of law, under the Fifth, Seventh, and Fourteenth Amendments of the United States Constitution, their rights to a speedy trial and to be informed of the nature and cause of the accusations and to be confronted with the witnesses against them and to have compulsory process for obtaining witnesses in their favor under the Sixth Amendment of the United States Constitution, also giving rise to Section 1985 and Section 1986 actions, in addition to Section 1983 And, as well being in Violation of The Plaintiffs rights under The Constitution of State of Hawaii.

72.  Defendants DOES 1 through 50 are sued as fictitious names their true names and capacities being unknown to plaintiffs.   When ascertained,  plaintiffs will amend the complaint by inserting their true names and capacities.  Plaintiffs are informed and believe and then allege that each of the fictitiously named "Defendants" is responsible in some manner for occurrences herein alleged and those "Defendants"  proximately caused and are responsible for and are legally liable for plaintiffs' damages herein alleged.  Each reference in this complaint to "Defendant",  "Defendants"  or a specifically named "Defendant" refers to and includes all

"Defendants" including those sued under such fictitious names on information and belief.

PLAINTIFFS make all allegations contained in these complaint against all "Defendants", including

DOES 1 through 50.   Wherever in the complaint references made to any act of "Defendants".

Such allegations shall be deemed to mean all named "Defendants" and DOES 1 through 50 or

their officers, agents, managers, Representatives,. Employees,. Heirs,. Assignees, customers,

tenants, who did or authorize such acts while actively engaged in the operation, management,

direction or control of the affairs of Defendants and while acting within the course and scope of

their duties except as specifically alleged to the contrary at all times herein mentioned with

respect to the specific matters alleged in this Complaint is informed and believes that each

Defendant including DOES 1 through 50 was a parent, subsidiary, affiliate, alter ego, partner,

agent, franchise licensee, employee, employer controlling franchiser, controlling licensee or

your principal and or joint venture of each of the remaining Defendants and was at all times

acting within the course and scope of such agency service employment or joint venture and

each Defendant has ratified, approved, conspired and profited from and or authorized the act

of each of the remaining Defendants and or failed to prevent such acts when having the proper

of the power and or duty to do so with full knowledge of said facts general allegations.

73. JOAN SPARROW, RICHARD MEYER , KYMBERLY SPARROW , and the children, constituted a

family unit entitled to constitutional protections including but not limited to the right to live

together free of unwarranted governmental interference, the right to familiar privacy and the

right of parents and family to reasonably direct the upbringing of their children and

grandchildren.

74.    Defendant  LEAHNE TOSCANO and DOES 1 through 50 had a duty to plaintiffs at all times to establish, implement and follow policies, procedures, customs and or practices here and after referred to as "policy" or "policies" which conform and provide the protections guaranteed PLAINTIFFS under the United States Constitution including those under the First, Fourth and Fourteenth Amendments to include without limitation the protection of the right to familial relations, the right to privacy the right not be defamed or stigmatized, the right to be free of governmental deception, trickery, fabrication of evidence and suppression of exculpatory evidence in juvenile dependency proceedings; and the right to procedural due process. Said defendants also had a duty to use reasonable care to select, assign, supervise,  train,  control and review the activities of all their agents, officers, employees and those acting under them including within CWS so as to protect their constitutional rights and to refrain from acting with deliberate indifference to the constitutional rights of PLAINTIFFS in order to avoid causing the injuries and damages alleged herein.

75.    Based on the powers and duties charged to CWS and duly delegated to LEAHNE TOSCANO, including the powers to seize children from their parents or family's care LEAHNE TOSCANO and DOES 1 through 50,  as policy making officials knew,  or should have known of the need to establish customs.  policies and practices and procedures as required to protect the aforementioned Constitutional rights of parents and family and their children with whom State agents regularly came into contact;  yet on information and belief turned a blind eye to such need and/or were deliberately indifferent to it.

76.  At the time of the underlying events defendant LEAHNE TOSCANO and DOES 1 through 50 established customs and practices and or knowingly and willfully permitted the following improper customs,  practices and usages to persist

a.  the custom and/or practice of detaining and or removing children from their family and homes without exigent circumstances,  imminent danger of serious bodily injury, court order and or consent,

b.  the custom and or practice of removing children from their family and their homes without first obtaining a warrant when no exigency exists,

c.  the policy of medically examining children without exigency, need, or proper court order, and without the presence and/or consent of their parent or family,

d.  the policy of  removing and detaining children and continuing to detain them for an unreasonable period. long after any alleged basis for detention is negated,

e.  the custom and or practice of interrogating and or examining a child outside the presence of its parents without judicial authorization or parental consent when there is no specific reasonable and articulable evidence that the child is in imminent immediate risk of suffering serious bodily injury,

f.  the custom and or practice of using trickery, duress, fabrication and or false testimony and or evidence and in failing to disclose known exculpatory evidence in preparing and presenting reports and court documents to the court causing an interference with parental and family rights including those as to familial relations,

g.  the unwritten policy of acting with deliberate  indifference to the rights of children and parents with whom CWS agents can regularly be expected to come into contact by failing and or refusing to implement a practice on regular and adequate training and or supervision and/or by failing to train and or supervise its officers, agents, employees and state actors in providing and ensuring compliance with the constitutional protections guaranteed to individuals including those under the First, Fourth and Fourteenth Amendments when performing actions related to child abuse and dependency type investigations and court proceedings,

h.   practice of setting forth allegations in juvenile dependency petitions against parents claiming child abuse regardless of whether or not specific articulable evidence exists at the time to support the claim set out in the petition which is required by law to be verified under penalty of perjury,

i.  the practice or custom of making knowingly false allegations of child abuse, neglect or abandonment in juvenile dependency petition signed under penalty of perjury as a means of intimidating parents or family members by coercion into accepting lesser charges whether true or not and whether justified by extent evidence or not thereby enabling the county to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to finding by the state and federal governments,

j.  the custom and/or practice of fraudulently charging parents with child abuse where none exists,

k. the consistent failure by LEAHNE TOSCANO  and DOES 1  through 50 to investigate violations of constitutional rights by social workers and consistent failure to discipline social

workers and their supervisors involved in constitutional violations so that violations of citizens

constitutional rights were not only accepted but were customary.

(This list is not exhaustive due to the pending nature of discovery and the privileged and

protected records of investigative and juvenile dependency type proceedings plaintiff may seek

leave to amend this pleading as more information becomes available.).

77.   Each of the aforementioned customs and or practices were the moving force that is the

actual direct and proximate cause of the violations of PLAINTIFFS' constitutional rights.

78.   On information and belief LEAHNE TOSCANO and DOES 1 through 50 have ratified,

permitted and condoned each of the customs and or practices identified above on an ongoing

and continuous basing basis  and continue to ratify  permit and condone said practices on an

ongoing and daily basis.

79.    LEAHNE TOSCANO  and DOES 1 through 50 are aware that their social workers; (1) Remove

these children from the care of their parents without first obtaining judicial authorization when

there is no emergency circumstance and in contravention of the rights of both parents, family

and children,  (2)  regularly engage in deception and the presentation of evidence in the juvenile

court when they file and submit reports and documents submitted through the juvenile

dependency course with the intention that it be accepted into evidence and relied upon by the

court in rendering its decisions;

(3)  regularly subject seized children to medical examinations without the knowledge consent or

presence of their parents yet LEAHNE TOSCANO and DOES 1 through 50 have made a knowing

and conscious decision to refrain from promulgating a policy to prevent such misconduct and

have consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children and family to remain together absent undue government interference.  The obligation of the officers to first obtain a warrant before seizing children from their families their parents, their families when no exemption  exists,  the obligation of the social workers to give notice of and permit parents/family to attend the medical examination of their children and or the obligations to refrain from engaging in deception and the presentation of evidence to the juvenile court LEAHNE TOSCANO's and DOES 1 thrrough 50s decision to disregard these constitutional protections in the face of a no need for such policies to prevent the specific misconduct alleged here in above, i.e, the known need for a specific policy prohibiting its social workers from seizing children from their parents or family without a warrant or emergency is itself a policy decision which constitutes the policy of deliberate indifference.  Said policy of deliberate indifference and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the PLAINTIFFS  harm and that the social worker Defendants both followed and acted pursuant to the regularly established customs,  practices,  and well known and accepted standard operating procedures when they  (1)  seized children; (2) interviewed and examined the children without judicial authorization,  parental consent and without specific reasonable and articulable evidence to suggest that the children were in immediate risk of suffering serious bodily injury none of which was constitutionally permissible and  (3) engaged in deception and the presentation of evidence in juvenile court and

All of which would never have happened if LEAHNE TOSCANO  and DOES 1 through 50 had refrained from deliberately ignoring their obligation to promulgate policies and the concomitant

training necessary to inform their social workers of the constitutional proscriptions which govern their daily work;

80.  PLAINTIFFS are informed and believe that LEAHNE TOSCANO and DOES 1 through 50 failed to establish,  adopt and/or implement policies procedures and training regarding the constitutional protections afforded to a parent and child by the First, Fourth and Fourteenth Amendments without such policies,  procedures,  customs and/or practices in place the CWS social workers were allowed and permitted to engage in contact that was in violation of PLAINTIFFS'  constitutional rights as more specifically alleged in the general allegations set out herein above.

81.  On information and belief LEAHNE TOSCANO's and DOES 1 through 50's  failure to adopt such policies was the moving force behind the violations of PLAINTIFFS' constitutional rights and includes but is not limited to LEAHNE TOSCANO and DOES  1 through 50 promulgated no written policy procedure,  custom practice and or training regarding the circumstances under which a social worker must obtain judicial authorization prior to removing a child from the custody of its parent/family.  DOES 1 through 50 promulgated no written policy procedure custom practice and or training requiring a social worker to obtain judicial authorization prior to removing a child from the custody of its parents when there was no evidence that the child was in immediate risk of suffering serious bodily injury.  LEAHNE TOSCANO and DOES 1 through 50 promulgated no written policy procedure custom practice and or training delineating the constitutional protections afforded to a parent and child by the first, Fourth and Fourteenth Amendment  LEAHNE TOSCANO and DOES 1 through 50 promulgated no written policy procedure custom practice and/or  training instructing that a social worker must possess

specific articulate evidence that a child would be placed at imminent risk of suffering serious

harm at the hands of the parents or family prior to removing the child from its family custody

without judicial authorization LEAHNE TOSCANO and DOES 1  through 50 promulgated no

written policy procedure custom practice and/or training instructing the social worker must

obtain judicial authorization or parental consent prior to interviewing his coming under

interrogating a child outside the presence of its parent when there is no specific articulable

evidence the child is in Immediate risk of suffering serious bodily injury.  LEAHNE TOSCANO

and DOES 1 through 50 promulgated no written policy procedure custom practice under training

instructing that  social worker must disclose all known exculpatory evidence to the juvenile

court .  LEAHNE TOSCANO and DOES 1 through 50 promulgated no written policy procedure

custom practice on her training instructing that a social worker is precluded from including false

statements and documents or reports to the juvenile court.

   82.  All of these issues were ignored in the face of unknown need for such policies procedures

and or training and supervision by deliberately refraining from promulgating any of the

aforementioned policies, procedures, customs, practices and or training LEAHNE TOSCANO  and

DOES 1 through 50 permitted the aforementioned basic policy decisions to be made by the

lower level social workers who come into regular contact with the public, i.e.  the parents and

children they are supposed to serve.  As  a result LEAHNE TOSCANO  and DOES 1 through 50s

policy custom and/or practice as established, adopted and implemented by the social worker

Defendants through their conduct was to detain children,  particularly the PLAINTIFFS from their

parents without judicial authorization,  parental consent and without specific reasonable and

articulable evidence to suggest that the particular child is or was in immediate risk of suffering

serious bodily injury and to engage in deception and the presentation of evidence to the juvenile court. These policies, customs and their practices that disregard the PLAINTIFFS' constitutional protections were a substantial factor in causing harm to the PLAINTIFFS. Thus as a matter of law because there was no formal policy preventing the aforementioned misconduct even though one was obviously needed the CWS agents on the line acted on behalf of LEAHNE TOSCANO and DOES 1 through 50 and making final policy decisions which is exactly what they did when they seized the PLAINTIFF's children without a warrant and in the absence of any exigency, caused them to be medically examined without the consent to or presence of their parents or family and engaged in deception in the presentation of evidence to the juvenile court as alleged herein above.

83. The state of the law regarding the constitutional protections afforded to a parent and child by the First, Fourth and Fourteenth Amendments was clearly established well before as such LEAHNE TOSCANO and DOES one through 50 knew before that their social workers required training on the constitutional protections afforded to a parent and child on information and belief despite the knowledge. LEAHNE TOSCANO and DOES 1 through 50 deliberately failed to train their social workers on these constitutional protections including but not limited to the following

a. LEAHNE TOSCANO 1 through 50 did not provide training to their social workers regarding the circumstances under which judicial authorization must be attained prior to removing a child from the custody of its parents.

b.  LEAHNE TOSCANO and DOES 1  through 50 did not provide training to their social workers regarding the fact that judicial authorization must be obtained prior to removing a child from the custody of its parents when there is no evidence that the child was in immediate risk of suffering serious bodily injury,

c.  LEANHE TOSCANO  and DOES  1 through 50 did not provide training to their social workers regarding the fact that the judicial authorization or parental consent is required prior to interviewing examining and or interrogating a child outside the presence of its parents when there's no specific articulable evidence that the child is in immediate risk of serious bodily injury.

d.  LEAHNE TOSCANO and DOES 1  through 50 did not provide training to their social workers on the well established constitutional protections afforded to a parent and child by the Amendments.

e.  LEAHNE TOSCANO and DOES 1 through 50 did not provide training to their social workers instructing that a social worker must disclose all known exculpatory evidence to the juvenile court.

f.  LEAHNE TOSCANO and DOES  1 through 50 did not provide training to their social workers instructing the social worker is precluded from including false statements and documents or reports to the juvenile court.

84.   LEAHNE TOSCANO's  and DOES 1 through 50's deliberate failure to train their social workers on these established constitutional protections was a substantial factor in causing the PLAINTIFF's harm and that agents working for the CWS were unfamiliar with and oblivious to the PLAINTIFF's  constitutional rights when the social worker Defendants (1)  seized plaintiffs children without judicial authorization,  parental consent and in the acts absence of exigent circumstance and(2) two engaged in deception in the presentation of evidence to the juvenile court and subjected the children to medical examinations without notice to or the presence of their parents.

85. PLAINTIFFS are informed and believe that LEAHNE TOSCANO and DOES 1 through 50  (1) failed to investigate the social worker Defendant's seizure of PLAINTIFF'S children from their custody without judicial authorization parental consent and without specific reasonable articulable evidence to suggest that the children were in immediate risk of suffering serious bodily injury and/or (2) engage in deception in the presentation of evidence to the juvenile court as set forth in the general allegations.

86.  PLAINTIFFS are further informed and believe that LEAHNE TOSCANO endorsed 1 through 50 never investigate a social worker who (1)  seizes a child from his parents custody without judicial authorization parental consent and without specific reasonable and articulable evidence to suggest the child's in immediate risk of suffering serious bodily injury and or (2) subjects these children to medical examinations without notice to or the presence of their parents (3) engages in deception and the presentation of evidence to the juvenile court.

87.  PLAINTIFFS are informed and believe that LEAHNE TOSCANO and DOES 1  through 50 failed to discipline social workers  Defendants for seizing PLAINTIFF's children from their custody without judicial authorization parental consent and without specific reasonable articulable evidence suggests that the children were in immediate risk of suffering serious bodily injury and or subjecting seized children to medical examinations without notice to or the presence of their parents engaging in deception they'll be presentation of evidence to the juvenile court as set forth in the general allegations.

88.  PLAINTIFFS are further informed and believe that LEAHNE TOSCANO  and DOES 1 through 50 never discipline a social worker for seizing  children within their custody (1) without judicial authorization, parental consent,  without specific reasonable and articulable evidence suggests that children are in immediate risk of suffering serious bodily injury and/or (2) subjecting seized children to medical examinations without notice to or the presence of their parents engaging in deception in the presentation of evidence to the juvenile court.

89.  The seizures of PLAINTIFF's children from their custody without judicial authorization parental consent and without specific reasonable and articulable evidence suggests that the children are in immediate risk of suffering serious bodily injury was perpetrated by  social workers and accord had at one location PLAINTIFFS are informed and believe that the warrantless seizure of their children by the social workers was not an isolated incident. Specifically their circumstances on the current trickery such warrantless and unlawful seizures are regular and recurring.  The Defendants' engagement in deception and the presentation of evidence to the juvenile court was perpetrated by several social workers and occurred over an extended period of time

90.  PLAINTIFFS are informed and believed that the Defendants' engagement and deception in the presentation of evidence to the juvenile court was not an isolated incident specific to their circumstances.   On the contrary such decent conduct is regular and recurring, the conduct described herein is so pervasive that it's become common knowledge that the type of conduct alleged here and it's commonplace within CWS to such an extent that LEAHNE TOSCANO  and DOES 1   through 50 deliberate indifference to the need to promulgate policies and  provide training to rein in its social workers and prevent the type of misconduct alleged herein.  Such a policy of indifference was in fact the moving force behind the violation of PLAINTIFFS' constitutional rights as alleged herein above namely PLAINTIFFS'  constitutional rights were violated as mentioned above when defendants LEAHNE TOSCANO and DOES 1 through 50, while acting under color  of state law and in conformance with the fictional customs and practices of the CWS jointly acted to see if PLAINTIFF'S children without a warrant subjected them to medical examinations without notice to or the presence of their parents and then lied about PLAINTIFFS in various court records reports submitted to the juvenile court in order to continue the baseless detention of their children.

91.   These actions and or inactions of LEAHNE TOSCANO and DOES 1 through 50 were the moving force behind and direct and proximate cause of PLAINTIFFS' injuries alleged herein and as a result PLAINTIFFS  have sustained general and special damages to an extent and in an amount to be proven at trial.    In addition 8LAINTIFFS have incurred and will continue to incur attorneys' fees,  costs and expenses including those as authorized by 42 U. S. C-section 1988 to an extent and in an amount subject to proof at trial.

**SECOND CLAIM FOR RELIEF**

**Declarative and/or Injunctive Relief By All Plaintiffs Against CWS**

92.  PLAINTIFFS allege and incorporate herein as if set forth in full the allegations set forth in paragraphs 1 through 91  herein.

93.  As stated herein, defendants LEAHNE TOSCANO and DOES 1  through 50, inclusive, have wrongfully, unlawfully, and with deliberate indifference to the rights of PLAINTIFFS and with utter disregard of their and CWS's duties and obligations to PLAINTIFFS, acted, practiced and or adopted policies, practices, procedures and or customs which are in violation of the rights of PLAINTIFFS,  including those to be free  from governmental interference as to their familial associations and from unreasonable searches or seizures including those relating to child abuse allegations and related actions and proceedings.

94.  CWS and its section administrator LEAHNE TOSCANO and DOES1 through 50 have knowingly failed to address their subordinate employees' improper,  unlawful and unconstitutional actions,  conduct and policies  at the time of the industry incidents at issue in this present action and PLAINTIFFS are informed and believe and on that basis allege that presently CWS has not changed or modified such actions, customs, practices and/or policies to conform to law and continues to seize children from their parents without a warrant probable cause or exigency and to perform physical exams on such children without a court order exigency or notice to or the presence of their parents or family.

95. CWS' wrongful and unlawful conduct,  actions and or policies unless and until enjoined and restrained and restrained by order of this court will cause and continue to cause great and irreparable injury to PLAINTIFFS and other individuals and citizens and that CWS will continue to

act in accordance with said unlawful policies and with deliberate indifference to its duties and obligations under state and federal law including those under the First, Fourth and Fourteenth Amendments as alleged herein.

96. PLAINTIFFS have no adequate remedy at law to prevent or prohibit CWS and its social workers from continuing and or repeating its unlawful and unconstitutional conduct and policies other than through injunctive relief and therefore seek an order enjoining and prohibiting CWS from continuing but not limited to the following:

    a.   the policy of detaining and removing children from their family and homes without exigent circumstances, imminent danger of serious bodily injury court order and or consent;

    b.   the policy of removing children from their family their homes without first obtaining a warrant when no exigency exists;

    c,   the policy of medically examining children without exigency need or proper court order and without the presence and or consent of their parent or guardian'

    d.   the policy of removing and detaining children and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

    e.   the policy of using trickery, duress, fabrication and or false testimony and or evidence in failing to disclose , exculpatory evidence and preparing and presenting reports and court documents to the court causing an interference with parental rights including those as to familial relations;

    f.   the policy of acting with deliberate indifference in implementing a policy of inadequate training and or supervision and or by failing to maintain and or

supervise its officers, agents, employees and state actors in providing the constitutional protections guaranteed to individuals including those under the Fourth and Fourteenth Amendments when performing actions related to child abuse and dependency type proceedings;

g.  the practice of setting forth allegations in juvenile dependency petitions against parents claiming child abuse, regardless of whether or not reasonable and articulable evidence exists at the time to support the claim set out in the petition under penalty of perjury;

h. the policy practice or custom of making knowingly false allegations of child abuse neglect or abandonment in juvenile dependency petitions signed under penalty of perjury as a means of intimidating parents by coercion into accepting lesser charges whether true or not and whether justified by extant evidence or not; thereby enabling the County to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to finding by the State and Federal governments, and

i. the custom, policy and/or practice of fraudulently charging parents with child abuse when none exists.

This is not an exhaustive list due to the  pending nature of delivery and the privileged and protected records of investigative and juvenile dependency type proceedings,

Plaintiffs  may seek leave to amend this pleading as more formation becomes
available.)

**JURY DEMAND**

Trial by Jury is Hereby Demanded on all claims alleged herein, which are triable and the
parties are hereby given notice, pursuant to Fed. R. Civ. P. 38(a)-(c).

**PRAYER**

**WHEREFORE**, PLAINTIFFS Respectfully Pray for Judgement against all
Defendants as to all causes of action and ask that this Court enter an Order:

.    1. Issuing Declaratory Relief, Declaring that the acts and omissions of the
DEFENDANTS have Violated PLAINTIFFS Rights, and stating the
DEFENDANTS' Duties with respect to those Rights;


2.   . Issuing Injunctive Relief, commanding the DEFENDANTS to
Provide PLAINTIFFS with the minor children J.M.S., A.H.M. and S.K.S. back in
their Care and Custody in The Family Home. And

3. Reverse any Orders which were Unconstitutionally and illegally
granted and obtained through the deprivation of PLAINTIFFS KYMBERLY
DAWN SPARROW, JOAN SPARROW and minor children J.M.S., A.H.M. and
S.K.S of their Rights under The Constitution of The United States of America
and The Constitution of The State of Hawaii. and

4. Expunge the  PLAINTIFFS KYMBERLY DAWN SPARROW's and JOAN
SPARROW's records with Child Welfare Services and Child Protection

Services.

  5.  Awarding PLAINTIFFS Compensatory Damages for the IIED (Intentional Infliction of Emotional Distress) and NIED (Negligent Infliction of Emotional Distress) in a monetary amount to be determined and proven through evidence in Court.

6.  Awarding PLAINTIFFS Punitive Damages in a monetary amount to be determined and proven through evidence in Court, in order to Deter the DEFENDANTS from continuing to perpetrate these practices on any other innocent and unsuspecting Families

  7.  Costs of suit incurred herein;

  8.  Any other Relief that this Court may deem just and proper.

Respectfully Submitted this 27th day of November, 2023.

/s_____

KYMBERLY DAWN SPARROW

PRO SE

IX.   VERIFICATION

Pursuant to 28 U.S.C.   1746,  I  Kymberly D. Sparrow, declare and verify, under penalty of Perjury under the laws of the United States of America, that I have read the foregoing and that it is true and correct to the best of my belief and knowledge.

Dated this ____ day of November, 2023.

Notary Public

Kymberly D. Sparrow

Pro se

CIVIL RIGHTS COMPLAINT   [   1983]